**In re TYSON FOODS, INC. CON-SOLIDATED SHAREHOLD-ER LITIGATION.**

C.A. No. 1106–N.

Court of Chancery of Delaware,
New Castle County.

Submitted: Sept. 20, 2006.
Decided: Feb. 6, 2007.

Stuart M. Grant, Megan D. McIntyre, and Michael J. Barry, of Grant & Eisenhofer P.A., Wilmington, DE; Jeffrey G. Smith and Robert Abrams, of Wolf Haldenstein Adler Freeman & Herz, LLP, New York City, of counsel, for Plaintiffs.

A. Gilchrist Sparks, III, S. Mark Hurd, and Samuel T. Hirzel, of Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, DE; David F. Graham, Anne E. Rea, and Julie K. Potter, of Sidley Austin, LLP, Chicago, IL, of counsel, for Defendants.

Kurt M. Heyman and Patricia L. Enerio, of Proctor Heyman, LLP, Wilmington, DE, for Nominal Defendant.

## OPINION

CHANDLER, Chancellor.

Before me is a motion to dismiss a lengthy and complex complaint that includes almost a decade's worth of challenged transactions. Plaintiffs level charges, more or less indiscriminately, at eighteen individual defendants, one partnership, and the company itself as a nominal defendant. Several allegations are leveled at clearly inappropriate directors or challenge actions well beyond the statute of limitations. Over six hundred pages of additional documents and briefs have been filed by one party or another in order to provide context for my decision. Although I do not grant defendants' motion in its entirety, I may at this point winnow the grist of future proceedings from chaff that may be dismissed.

My decision is divided roughly into three parts. First, I describe in some detail the parties, the facts alleged in plaintiffs' com-

plaint (and any appropriate accompanying materials), and the parties' primary contentions. Second, I describe the legal standards that are applicable across most counts in the complaint: the demand requirement and the statute of limitations. Finally, I evaluate each count of the consolidated complaint separately, highlighting the relevant legal issues and determining the extent to which a particular count may be limited or dismissed altogether.

In evaluating a motion to dismiss, I must accept as true all well-pleaded factual allegations.[1] Such facts must be asserted in the complaint, not merely in briefs or oral argument.[2] I must draw all reasonable inferences in favor of the non-moving party, and dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[3]

## I. PARTIES AND PROCEDURAL HISTORY

This case arises from an unusually complex procedural history. Plaintiffs' consolidated complaint is the fourth iteration arising from defendants' challenged actions. Before delving into disputes spanning over a decade and the events that bring the parties before this Court, I pause briefly to describe the relevant players.

### A. The Plaintiffs

An SEC investigation regarding the proper classification of executive perquisites aroused the suspicions of plaintiff Eric Meyer, a New Jersey resident and Tyson shareholder. He made a written demand for documents to the company pursuant to 8 *Del. C.* § 220 on August 26, 2004. After almost a year of wrangling over precisely which papers were and were not to be produced, Tyson handed over an agreed upon set of documents on July 21, 2005. Meyer then filed his initial lawsuit on September 12, 2005.

Meyer was not alone in his concerns. Plaintiff Amalgamated Bank, a New York-based banking institution, had begun its own investigation slightly earlier.[4] Its action, filed on February 16, 2005, included both class action and derivative complaints for breaches of fiduciary duty and proxy disclosure violations. Amalgamated's complaint was later amended on July 1, 2005.

On September 21, 2005, this Court requested that counsel for the two plaintiffs confer and determine whether their actions could be consolidated. They agreed and filed the consolidated complaint on January 11, 2006.

### B. Tyson Foods, Inc.

Tyson Foods, Inc., a Delaware corporation with its principal office in Springdale, Arkansas, provides more protein products to the world than any other firm. Founded in the 1930s, the Tyson family has at all times kept the company under its power and direction. Tyson's share ownership structure ensures this: as of October 2, 2004, Tyson had 250,560,172 shares of Class A common stock and 101,625,548 shares of Class B common stock outstanding. Each Class A shareholder may cast

1. *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del.2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–7 (Del. 2002)).

2. *Orman v. Cullman*, 794 A.2d 5, 28 n. 59 (Del.Ch.2002).

3. *In re Gen. Motors*, 897 A.2d at 168 (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del.2002)).

4. Amalgamated's shareholder standing derives from its trusteeship of the LongView MidCap 400 Index Fund.

one vote per share on all matters subject to the shareholder franchise, while Class B shareholders may cast ten votes for each one of their Class B shares.

The Tyson Limited Partnership ("TLP"), a limited partnership organized in Delaware, owns 99.9% of the Class B stock, thus controlling over 80% of the company's voting power. In turn, Don Tyson controls 99% of TLP, either directly or indirectly through the Randal W. Tyson Testamentary Trust. Tyson Limited Partnership is also a defendant in this matter.

### C. Defendant Board Members

Defendant Don Tyson has served as a director since 1952, and as Senior Chairman of the Board from 1995 to 2001. He has retired from that position, but remains employed as a consultant to the Tyson firm. He maintains his position as the managing general partner of TLP.

Defendant John Tyson, son of Don Tyson, joined the board in 1984 and was elevated to Chairman in 1998. In April 2000, he became Tyson's Chief Executive Officer. Like his father, he is a general partner of TLP.

Defendant Barbara Tyson, the widow of Randal Tyson and the sister-in-law of Don Tyson, took her board position in 1998. Retiring from the company's Vice Presidency in 2002, Ms. Tyson entered into a consultancy arrangement with the company. She remains a shareholder in the company and a general partner of TLP.

Defendant Lloyd V. Hackley came to the board in 1992. Hackley beneficially owns at least 13,510 shares of Tyson Class A common stock and serves as Chairman of the Governance Committee.

Defendant Jim Kever, besides serving on Tyson's board, also owns twelve percent of the shares of DigiScript, Inc., a company in which John Tyson made an indirect investment in 2003. He serves as the Chairman of the Audit Committee and sits on the Governance Committee. Kever owns at least 2,621 shares of Tyson Class A common stock.

Defendant David A. Jones joined the board in 2000, beneficially owns 2,492 shares of Tyson Class A stock, and served on the Compensation and Audit Committees. He resigned from the Tyson board in 2005, shortly after this action was filed.

Defendant Richard L. Bond, Tyson's President and Chief Operating Officer, also sits on the board of directors. He owns at least 1,523,288 shares of Tyson Class A common stock as well as significant quantities of restricted stock. He serves as an officer under a contract that extends through February 2008.

Defendant Jo Ann R. Smith joined the Tyson board in 2001 and remains a director. She is president of Smith Associates, an agricultural marketing business. Chairperson of the Compensation Committee and a member of the Audit and Governance Committees, she is also the beneficial owner of 6,932 shares of Tyson Class A common stock.

Defendant Leland E. Tollett has been a board member since 1984. He served as the Chairman of the Board and Chief Executive Officer from 1995 to 1998. After retiring in 1998, he signed a ten-year consulting contract which provided for payments of $310,000 per year for the first five years and $125,000 per year for the remainder of the term, as well as providing for the vesting of Tollett's outstanding options and continuing health insurance. He is a general partner of TLP and the beneficial owner of 3,398,034 shares of Tyson Class A common stock.

Defendant Wayne B. Britt sat on the Tyson board from 1998 to 2000. He served as Chief Executive Officer from 1998 until

2000, as Executive Vice President and Chief Financial Officer from 1996 to 1998, as Senior Vice President, International Division from 1994 to 1996, as Vice President, Wholesale Club Sales and Marketing from 1992 to 1994, and in a variety of positions before 1992.

Defendant Joe F. Starr served on the Tyson board from 1969 until 1992. He also served as Vice President until 1996.

Defendant Neely E. Cassady participated in the board's Audit and Compensation Committees from 1994 to 2000 and was a member of the Special Committee from 1997 to 2000. He started on the board in 1974 and left in 2000.

Defendant Fred Vorsanger held a board position from 1977 until 2000. During his tenure he served on the Audit, Compensation, and Special Committees.

Tyson elected defendant Shelby D. Massey to the board in 1985, where he remained until 2002. He served as Senior Vice Chairman from 1985 until 1988. He was a member of the Compensation Committee (approximately 1994 to 2002), Special Committee (1997 to 2002) and Governance Committee (2002).

Defendant Donald E. Wray was a board member from 1994 to 2002. He also held the positions of President from April 1995 until 2000 and Chief Operating Officer from 1991 until 1999. Wray currently holds a Senior Executive Employment Agreement that extends until 2008.

Defendant Gerald M. Johnston served on the board from 1996 until 2002. From 1981 to 1996, he served as Executive Vice President of Finance, after which he stepped down and became a consultant for Tyson.

Defendant Barbara Allen served on the board between 2000 and 2002. She was selected at various times to participate on the Compensation and Audit Committees as well as the Compensation Subcommittee.

Defendant Albert C. Zapanta is President and CEO of the United States–Mexico Chamber of Commerce. He joined the board in May 2004 and sits on the Compensation and Governance committees.

## II. FACTUAL BACKGROUND

### A. The Herbets Action and the Formation of the Special Committee

Many of the defendants do not find themselves before this Court for the first time answering challenges to their duty of loyalty. In February 1997, this Court entered an order pursuant to a settlement agreement in *Herbets v. Don Tyson* and, thus, resolved an earlier long-running dispute between the Tyson family and minority shareholders.[5] As is typical in such settlements, no defendant admitted to any wrongdoing whatsoever.[6] Nevertheless, as part of the settlement, Tyson Foods consented to create a "Special Committee" consisting of outside directors to annually review "the terms and fairness of all transactions between the company, on the one hand, and its directors, officers or their affiliates, on the other, which are required

---

**5.** C.A. No. 14231 (Del. Ch. Feb. 7, 1997).

**6.** Defs.' Opening Br. in Supp. of Mot. to Dismiss Ex. O at 14–15 [hereinafter *"Herbets* Settlement"]. ("No provision contained in this Stipulation, nor any document prepared or proceeding taken in connection with this Stipulation, shall be deemed an admission by any of the Defendants as to any claims alleged

or asserted ... and neither this Stipulation nor the negotiations or proceedings in connection with this Stipulation shall be offered or received in evidence at any action or proceeding....") Nor can the fact of the settlement be used to prove liability for any of the actions covered therein. Del. R. Evid. 408.

to be disclosed in the company's proxy statements pursuant to Securities and Exchange Commission regulations."[7] Further, the Special Committee was to "review the reasonableness of Don Tyson's requests for expense reimbursements annually."[8]

The Special Committee consisted of defendants Massey, Jones, Kever, and Hackley (who served as Chairman), although it is unclear who served at which times. The *Herbets* settlement required this committee to make its determinations once a year, and plaintiffs concede that it "held ... one meeting annually from 1999 to 2002...."[9] According to plaintiffs, the Committee did not review all of the related-party transactions or Don Tyson's requests for expenses, despite the annual meetings. Plaintiffs allege that the committee's limited review ignored recommendations of outside consultants and approved transactions without regard to their fairness to Tyson.

On August 2, 2002, the Special Committee was replaced by the Governance Committee. A charter provision required the Governance Committee to "review and approve" every "Covered Transaction,"

which is in turn defined as "any transaction ... between the Company and any officer, director, or affiliate of the company that would be required under the Securities and Exchange Commission rules and regulations to be disclosed in the company's annual proxy statement."[10] Such reviews were to be annual, and were to include analyses of whether the terms of related-party transactions were fair to the company. Although the charter provides that the Governance Committee is to meet "'normally ... four times per year,'" plaintiffs allege that it did not meet at all in 2002 and met only once in 2003 and once in 2004.[11] Plaintiffs identify defendants Hackley (Chairman), Massey, Kever, Jo Ann Smith and Albert Zapanta as former or current members of the Governance Committee.

### B. Compensation and Regulation Before the SEC Investigation in 2004

Plaintiffs contend that the *Herbets* settlement did little to prevent the Tyson family's abuse of the corporation and that the same managerial self-dealing complained of in 1997 continues to this day.

7. *Herbets* Settlement at 9–10.

8. *Id.* at 9.

9. Consol. Compl. at ¶ 60. Plaintiffs complain that the Special Committee "held only one meeting annually." The *Herbets* settlement contains a relatively simple set of requirements with regard to independent committees, however: there must be a committee, and that committee must once a year review at least two issues (Don Tyson's expenses and related-party transactions). *Herbets* Settlement at 9. The only requirement that the Governance Committee meet more often is allegedly contained in its charter, which specifies that the Committee should "normally ... [meet] four times per year." Consol. Compl. at ¶ 62.

10. Consol. Compl. at ¶ 61.

11. Once again, the timing of the Special Committee and Governance Committee meetings seem confused in the consolidated complaint. Plaintiffs make three assertions. First, "The Special Committee held only one meeting annually from 1999 to 2002, when it was replaced by the Governance Committee on August 2, 2002." *Id.* at ¶ 60. Second, "[The Governance Committee's charter provides that it is] to meet 'normally ... four times per year....'" *Id.* at ¶ 62. Finally, "[T]he Governance Committee did not meet at all in 2002, and met only once in 2003 and once in 2004." *Id.* Taken together, this suggests that some committee empowered to discuss related-party transactions met at least once per year between 1999 and 2004. This meets the requirements of the *Herbets* settlement, if not the Governance Committee Charter.

The complaint concentrates on three particular types of board malfeasance: (1) approval of consulting contracts that provided lucrative and undisclosed benefits to corporate insiders; (2) grants of "spring-loaded" stock options to insiders; and (3) acceptance of related-party transactions that favored insiders at the expense of shareholders.

### 1. The Don Tyson and Peterson Consulting Contracts

In 1998, John Tyson succeeded his father, Don Tyson, as Chairman of the Tyson Board of Directors and CEO. The elder Tyson remained until 2001 as Senior Chairman of the Board. Upon his retirement in October 2001, the board approved a pair of consulting contracts, one for Don Tyson and one for Robert Peterson, former Chairman of the Board and CEO of Iowa Beef Packers ("IBP").[12] Both contracts provided that the former executives would "upon reasonable request, provide advisory services ... as follows: ... (b) [Employee] may be required to devote up to twenty (20) hours per month...."[13] In the event of the employee's death before the expiration of the agreement, all payments and benefits were to go to designated survivors. Don Tyson's consulting contract provided for an annual payment of $800,000 for ten years, and granted the right to personal perquisites and benefits, including "'travel and entertainment costs ... consistent with past practices.'"[14]

**12.** IBP and Tyson Foods merged before Don Tyson retired.

**13.** Defs.' Opening Br. in Supp. of Mot. to Dismiss Exs. D & E.

**14.** *Id.*

**15.** Consol. Compl. at ¶ 134. Tyson's 2004 Proxy Statement, however, suggests a more complex and nuanced Stock Incentive Plan. The Proxy states:

Peterson's contract similarly entitled him to a payment of $400,000 per year for ten years plus personal perquisites and benefits.

Peterson died in May 2004, and his rights to salary and perquisites passed to his wife. Plaintiffs make much of the fact that Peterson rendered no services to the company after May 2004.

Plaintiffs also allege that defendants Tollett and Wray agreed to similar, if smaller, consulting contracts in 1999 and 1998 respectively. Both receive health insurance and the vesting of stock options throughout the terms of their agreements, in addition to annual payments ranging from $100,000 to $350,000 over ten years.

### 2. Stock Option Grants

In 2001, Tyson adopted a Stock Incentive Plan granting the board permission to award Class A shares, stock options, or other incentives to employees, officers, and directors of the company. Tyson gave the Compensation Committee and Compensation Subcommittee complete discretion as to when and to whom they would distribute these awards, but instructed that they were to consult with and receive recommendations from Tyson's Chairman and Chief Executive Officer. Plaintiffs allege that, at all relevant times, the Plan required that the price of the option be no lower than the fair market value of the company's stock on the day of the grant.[15]

The Plan provides for the grant of incentive stock options and nonqualified options.... The exercise price of an option shall be set forth in the applicable Stock Incentive agreement. The exercise price of an *incentive stock option* may not be less than the fair market value of the Class A Common Stock on the date of the grant (nor less than 100% of the fair market value if the participant owns more than 10% of the stock of the Company or any subsidiary).... *Nonqualified stock options* may be made exer-

■ Plaintiffs allege that the Compensation Committee, at the behest of several Defendant board members, "spring-loaded" these options. Days before Tyson would issue press releases that were very likely to drive stock prices higher, the Compensation Committee would award options to key employees.[16] Around 2.8 million shares of Tyson stock bounced from the corporate vaults to various defendants in this manner. Plaintiffs specifically identify four instances of allegedly well-timed option grants.

The Compensation Committee (then Massey, Vorsanger, and Cassady) granted John Tyson, former-CEO Wayne Britt, and then-COO Greg Lee options on 150,000 shares, 125,000 shares and 80,000 Class A shares, respectively, at $15 per share on September 28, 1999. The next day, Tyson informed the market that Smithfield Foods, Inc. had agreed to acquire Tyson's Pork Group. The announcement propelled the price upwards to $16.53 per share in less than six days, and to $17.50 per share by December 1, 1999.[17]

Once again, the Compensation Committee (then Massey, Hackley, and Allen) granted options on 200,000 Class A shares to John Tyson, 100,000 to Lee, and 50,000 to then-CFO Steven Hankins at $11.50 per share on March 29, 2001. A day later, Tyson publicly cancelled its $3.2 billion deal to acquire IBP, Inc. By the close of that day, the stock price had shot up to $13.47.

The Compensation Committee (then Hackley, Allen, and Massey) granted options on 200,000 Class A shares to John Tyson, 60,000 to Lee, and 15,000 to Hankins sometime in October 2001. Within two weeks, Tyson publicly announced its 2001 fourth-quarter earnings would be more than double those expected by analysts, catapulting the stock price to $11.90 by the end of November.

The Compensation Committee (then Smith, Jones, and Hackley) granted stock options to a number of executives and directors, including 500,000 to John Tyson, 280,000 to Bond, and 160,000 to Lee, at $13.33 per share on September 19, 2003. On September 23, 2003, Tyson publicly announced that earnings were to exceed Wall Street's expectations, propelling the price to $14.25.

### 3. Related Party Transactions

Proxy statements reveal that Tyson engaged in a total of $163 million in related-party transactions between 1998 and 2004, over ten percent of Tyson's $1.6 billion net earnings. Plaintiffs allege that the terms of these contracts have been consistently kept from minority shareholders, with defendants simply disclosing in each year's proxy statement the aggregate amounts paid to related entities in the previous fiscal year and a cursory description of the

cisable at a price equal to, less than or more than the fair market value of the Class A Common Stock on the date that the option is granted.

Defs.' Opening Br. in Supp. of Mot. to Dismiss Ex. M at 10–11 (emphasis added). The authority of the Compensation Committee to set a strike price depends upon whether the grant of options in question concerns "incentive" or "nonqualified" stock options.

16. A compensation committee that "spring loads" options grants them to executives before the release of material information reasonably expected to drive the shares of such options higher. (An opposite effect, "bullet dodging," is achieved by granting options to employees after the release of materially damaging information.)

17. Plaintiffs and defendants both agree that Tyson subsequently cancelled the grants to John Tyson and Lee, rendering moot any claim with respect to those grants. It remains unclear whether the grant to Britt was also cancelled.

nature of the transactions. According to plaintiffs, these transactions were unfair to the corporation, serving to enrich corporate insiders who made sure that the proxies were too misleading, incomplete, and cursory to constitute any real disclosure.

The consolidated complaint lists a motley of typical related-party transactions, including grow-out opportunities, farm leases, and other research and development contracts with insiders.[18] Plaintiffs allege that Tyson has never disclosed the prices at which it bought back livestock from corporate insiders through the grow-out programs.[19] Additionally, Tyson leased farms from various corporate insiders with a total value averaging over $2 million per year between 2001 and 2003.

A very liberal trade existed between directors (and ex-directors) and the company, of which the complaint provides many specific examples. Perhaps the most relevant involves defendants Shelby and Massey. After Massey's retirement in 2002, Tyson purchased over $10 million worth of cattle per year in 2002 and 2003 from Shelby Massey farms. Similarly, for the three years between 2001 and 2003 Tollett received $624,077 per year for breeder hen research and development.

Plaintiffs and defendants disagree vehemently on how many of the related-party transactions have actually been reviewed by the Special Committee. Meyer attempted to use his demand for records to verify that the Special Committee had approved all related-party transactions. But Meyer only requested documentation concerning a limited list of related-party transactions. Meyer alleges that he received documentation relating to further related-party transactions (including summary reports), and that from this the Court should conclude that the Committee considered only the transactions indicated by documents in the § 220 request. Of the $163 million in related-party transactions from 1998 through 2004, Meyer could only verify that the Committees had reviewed $69 million, or less than 42% of the total transactions by value. Specifically, plaintiff Meyer did not observe any evidence that the Committees had reviewed the swine grow-out program, the poultry grow-out program, cattle purchases from Massey, a lease of cold storage facilities partially owned by Johnston, or certain individual farm leases.

Defendants contend that I may not infer from these documents that the transactions were not in fact reviewed, notwithstanding the high degree of deference to which a plaintiff is entitled on a 12(b)(6) motion. Defendants point out that the documents requested in Meyer's § 220 demand did not cover all the transactions alleged in the complaint, and that the proxy statements repeatedly state that all transactions were reviewed.

It is true that a very strong negative inference is required for me to suppose

---

**18.** As described in the consolidated complaint, Tyson conducts grow-out operations by selling baby chicks and swine, feed, veterinary and technical services, supplies, and other related items to insiders, who then grow the animals to market age. The related parties then sell the mature animals either to Tyson or to unaffiliated companies when they are ready for market.

**19.** Although plaintiffs do not mention this specifically, the *Herbets* settlement contained an agreement that "in any future livestock and feed sale and repurchase transactions between the Company any directors [sic], officers or their affiliates, the profits, if any, in excess of the Company's short-term borrowing rate will be shared between the Company (75%) and the individual (25%)." *Herbets* Settlement at 8. The grow-out opportunities would seem to be subject to this earlier agreement.

from the facts alleged that the appropriate board committees did not review these transactions, yet two aspects of the complaint lead me to conclude that a negative inference is warranted. First, plaintiffs made a § 220 request to defendants who knew the crux of plaintiffs' complaint. Even if the request was in fact narrow, defendants had the opportunity to widen the scope of documents granted in order to exculpate themselves.[20] While they were, of course, not *required* to do so, it is more reasonable to infer that exculpatory documents would be provided than to believe the opposite: that such documents existed and yet were inexplicably withheld.

Second, the complaint contains detailed allegations that would lead me to infer that some transactions were not, in fact, reviewed. The SEC Order and the logo vendor transactions described below, for instance, suggest a board of directors that at the very least failed to pay sufficient attention to transactions with Don Tyson and his associates. It is not unreasonable to infer that a board which lets these transactions pass without scrutiny is not watching other related-party transactions with an eagle eye. Drawing every reasonable inference in favor of the plaintiffs, there is at least a suggestion that some transactions were not, in fact, reviewed.

In any event, plaintiffs allege that where an independent committee did review a transaction, such a review put little effort into considering whether the transactions simulated arms-length deals or whether bidding processes would have saved money. Three specific examples of improper reviews are alleged in the complaint: the

Arnett Sow Complex, the Tyson Children's Partnership Lease, and the Logo Vendor affair.

### a. Arnett Sow Complex

In the spring of 2000, an independent consultant advised that the company was paying an inflated rate of return to the Arnett Sow Complex (partially owned by Don Tyson and Starr) despite the fact that the complex was reportedly in worse shape than other suitable sow farms. The Pork Group (a subsidiary of Tyson) proposed that lease rates with the complex be revised downwards by 85% to reflect poor conditions within the industry. Plaintiffs contend that the board ignored these recommendations, although they admit that the company did cut the lease rates half as much as recommended by the Pork Group.

### b. Tyson Children's Partnership Lease

Plaintiffs allege that the company leased a farm belonging to the Tyson Children's Partnership at a much higher rate than would be expected in an arm's length transaction. The ten-year lease required payments of $450,000 per year (plus all taxes, utility costs, and insurance and maintenance costs) for a farm whose appraised value stood at $2.8 million. Plaintiffs also allege that an independent auditor was of the opinion that the lease was not an arms-length market lease.

### c. The Logo Vendor Affair

In addition to the Arnett Sow Complex and the Tyson Children's Family Lease, plaintiffs also point to a transaction with a "supplier of logo merchandise" owned by a

---

**20.** Advisors to Delaware corporations should realize by now that the company's books and records can serve as a "tool at hand" to defend against unfounded charges of wrongdoing. A books and records demand under 8 *Del. C.* § 220 can afford the company an opportunity to rebut a shareholder's complaint and actually deter the filing of litigation. *See* S. Mark Hurd & Lisa Whittaker, *Books and Records Demands and Litigation: Recent Trends and Their Implications for Corporate Governance,* 9 Del. L.Rev. 1, 32–36 (2006).

close personal friend of Don Tyson. Almost $5 million of product was purchased from the vendor without engaging in a bidding process. At the same time, the Compensation Committee was forced to cancel a company credit card that Don Tyson had given to the vendor without company authorization.

### C. The 2004 SEC Investigation of Don Tyson's Perquisites

In March 2004, the Securities and Exchange Commission (the "SEC") conducted a formal, non-public investigation into the annual perquisites given to several board members and other executives that had been disclosed as "other annual compensation" in the footnotes of Tyson's proxy statements. This "other annual compensation" category appeared every year since at least 1992, when only Don Tyson received such remuneration. In 1998, when John Tyson became Chairman of the Board, he too began receiving "other annual compensation." Upon his ascension to the board in 2001, Richard Bond, Tyson's then-President and Chief Operating Officer, started to benefit from "other annual compensation" as well. The proxy statement dated December 31, 2003 described this category of compensation as consisting of travel and entertainment costs, insurance premiums, reimbursements for income tax liability related to the travel and entertainment costs, and other such items.

The SEC investigation revealed that Tyson's proxy statements were incomplete and misleading between 1997 to 2003, in that they included under "travel and entertainment costs" expenses that could not reasonably be considered either travel or entertainment. On August 16, 2004, the SEC notified Tyson that it intended to recommend a civil enforcement action against the company and a separate action against Don Tyson. Further, the SEC was considering a monetary penalty based on Tyson's noncompliance with SEC regulations for the years 1997 through 2003. The noncompliance penalty would cover over $1.7 million of perquisites given to Don Tyson, the inadequacy of internal controls over the personal use of Tyson assets, and incomplete disclosure of perquisites and personal benefits.

Tyson consented to the SEC's entry of an "Order Instituting Cease–and–Desist Proceedings, Making Findings, and Imposing Cease–and–Desist Order Pursuant to Section 21C of the Securities Exchange Act of 1934" (the "Order").[21] In the Order, the SEC found that Tyson made misleading disclosure of perquisites and personal benefits provided to Don Tyson in proxy statements filed from 1997 to 2003. The Order described how Tyson had failed to disclose over $1 million in perquisites and improperly characterized many disclosed perquisites. Nearly $3 million worth of undisclosed or inadequately disclosed perquisites had been paid to Don Tyson, or to his family and friends, including use of the Tyson corporate credit cards for personal expenditures such as antiques, vacations, a horse, and substantial additional purchases of clothing, jewelry, artwork, and theater tickets. Family and friends were also allegedly given virtually unlimited use of corporate aircraft and company-owned homes in England and Cabo San Lucas, Mexico, including the use of company-paid chauffeurs, cars, cooks, housekeepers, landscapers, telephones, and a boat crew.

The Order found that Tyson made false or inadequate disclosures regarding the perquisites and personal benefits paid to Don Tyson pursuant to his 2001 consult-

---

**21.** Defs.' Opening Br. in Supp. of Mot. to Dismiss Ex. P.

ing agreement. The SEC further faulted Tyson for violating proxy solicitation and reporting provisions required by federal securities laws and failing to implement internal accounting controls over personal use of assets sufficient to detect, prevent, or account properly for Don Tyson's and his family's and friends' use of company assets. The Compensation Committee conducted its own investigation in light of the SEC findings and determined that Don Tyson should reimburse the company for improper compensation and perquisites.

Unsurprisingly, the 2004 proxy statement read quite differently from those of earlier years. First, it disclosed that Don Tyson had agreed to pay the company over $1.5 million as reimbursement for certain perquisites and personal benefits received during fiscal years 1997 through 2003, and that he had also agreed to pay an additional $200,000 for improper expenses. Second, Tyson disclosed that on July 30, 2004, it had approved an increase in Don Tyson's annual compensation pursuant to his consulting contract from $800,000 to $1.2 million annually, with the consideration to be paid, in the event of his death, to his three children until the termination of the contract in 2011.[22] The proxy statement further disclosed that the Governance Committee had approved the purchase by Tyson of over 1 million shares of Don Tyson's Class A common stock at a purchase price of $15.11 per share.[23]

## III. CONTENTIONS

From these facts, plaintiffs make nine separate claims, each of them against various defendants. In Counts I–IV, plaintiffs contend that the board violated its fiduciary duties by approving the Peterson and Don Tyson consulting contracts in 2001 and the amended Don Tyson consulting contract in 2004 (Count I); the awards of "Other Annual Compensation" between 2001 and 2003 (Count II); the "spring-loaded" options of 1999 to 2003 (Count III); and related-party transactions occurring since 1997 (Count IV). Count V, which is brought against every individual director, alleges a "pattern and practice of failing to investigate and disclose self-dealing payments," which plaintiffs contend not only wasted assets but also brought SEC investigations and fines against the company.[24] In the next two counts (VI and VII), plaintiffs contend that the defendant directors not only breached their contractual duties (Count VI) but also violated an order of this Court (Count VII) by failing to act in accordance with the *Herbets* settlement. Count VIII, a class action but not a derivative claim, maintains that the defendant directors materially misrepresented facts in the company's 2004 proxy statement such that the election of directors in that year should be held to be invalid. Finally, plaintiffs assert (Count IX) that the related-party transactions, spring-loaded options, consulting contracts and payments in the "other annual compensation" category amount to unjust enrichment of certain individual defendants, entitling the company to, among other things, a disgorgement of benefits from the unjustly enriched individual defendants.

22. Incidentally, the proxy statement **incorrectly** describes the terms of the contract as "Mr. Tyson *will* continue to furnish up to 20 hours *per week* of advisory services," while the contract actually states that he *may* furnish up to 20 hours per *month*. *Id.* at 41 (emphasis added).

23. Consol. Compl. at ¶ 131. Plaintiffs regard this as unseemly. There is no allegation, however, that the shares purchased were at more than market value.

24. Consol. Compl. at ¶ 188.

Defendants raise their own chorus of objections in support of their motion to dismiss. First, many of the claims (they say) are barred by the statute of limitations. Second, many claims are raised against directors who had little or nothing to do with the challenged decisions. Third, in some cases plaintiffs have brought derivative actions where demand was not excused. Finally, where the proper directors have been named in the complaint and the action itself is not time-barred, defendants assert that plaintiffs have not stated a claim for which relief can be granted.

## IV. DEMAND, INTERESTEDNESS AND INDEPENDENCE

Before addressing the morass of plaintiffs' various legal theories, it will be helpful to consider in detail two legal doctrines implicated in almost every count: the standards for demand excusal and the process by which the Delaware statute of limitations runs and is tolled.

■ The first hurdle facing any derivative complaint is Rule 23. 1, which requires that the complaint "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort." [25] Rule 23.1 stands for the proposition in Delaware corporate law that the business and affairs of a corporation, absent excep-

tional circumstances, are to be managed by its board of directors.[26] To this end, Rule 23.1 requires that a plaintiff who asserts that demand would be futile must "comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings" normally governed by Rule 8(a).[27] Vague or conclusory allegations do not suffice to upset the presumption of a director's capacity to consider demand.[28] As famously explained in *Aronson v. Lewis*, plaintiffs may establish that demand was futile by showing that there is a reason to doubt either (a) the disinterestedness and independence of a majority of the board upon whom demand would be made, or (b) the possibility that the transaction could have been an exercise of business judgment.[29]

■ There are two ways that a plaintiff can show that a director is unable to act objectively with respect to a pre-suit demand. Most obviously, a plaintiff can assert facts that demonstrate that a given director is personally interested in the outcome of litigation, in that the director will personally benefit or suffer as a result of the lawsuit in a manner that differs from shareholders generally.[30] A plaintiff may also challenge a director's independence by alleging facts illustrating that a given director is dominated through a "close personal or familial relationship or through force of will," [31] or is so beholden to an interested director that his or her "discre-

**25.** Ch. Ct. R. 23.1.

**26.** *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 2005 WL 2056651, at *31 (Del.Ch. Aug. 9, 2005).

**27.** *Zimmerman ex rel. Priceline.com, Inc. v. Braddock*, 2002 WL 31926608, at *7 (Del.Ch. Dec. 20, 2002).

**28.** *Id.*

**29.** *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).

**30.** *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049 (Del.2004).

**31.** *Orman v. Cullman*, 794 A.2d 5, 25 n. 50 (Del.Ch.2002).

tion would be sterilized."[32] Plaintiffs must show that the beholden director receives a benefit "upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively."[33]

Frequent confusion arises because the *Aronson* test for demand futility closely resembles the test for determining whether a duty of loyalty claim survives a motion to dismiss under Rule 12(b)(6). In both cases plaintiffs raise a reason to doubt the independence or interestedness of a majority—or even half—of a board of directors.[34] Given the fact that most claims involving the duty of loyalty are derivative, both analyses often appear in the same case.[35] The inquiries differ, however, in the level of detail demanded of the plaintiffs' allegations and the directors at whom the inquiry is directed. In the context of a motion to dismiss under Rule 23.1, the Court considers the directors in office at the time a plaintiff brings a complaint, and plaintiffs may not rely upon the notice pleading standards of Rule 8(a). In the context of a motion to dismiss for failure to state a claim, on the other hand, the directors relevant to the Court's decision will usually be those in office at the time the challenged decision was made, and the standard, while perhaps more rigorous in derivative cases than in some others,[36] does not reach so high a bar as Rule 23.1. In both cases this Court must make all inferences in favor of plaintiffs, but in the Rule 23.1 context such inferences may only be drawn from particularized facts, while in the former case I may draw from general, if not conclusory, allegations.

The distinction between the two processes is critical in sorting through the plaintiffs' complaint for two reasons. First, because the consolidated complaint challenges transactions going back almost a decade,[37] this case presents the relatively rare scenario in which the board members who may be liable for a given breach of fiduciary duty are significantly different from those upon whom demand is required. Second, plaintiffs have scattered their shot unevenly across their chosen targets: some defendant directors are alleged to be sufficiently entangled to be

32. *Beam,* 845 A.2d at 1050 (quoting *Grimes v. Donald,* 673 A.2d 1207, 1217 (Del.1996)).

33. *Telxon Corp. v. Meyerson,* 802 A.2d 257, 264 (Del.2002).

34. *See, e.g., In re The Limited S'holder Litig.,* 2002 WL 537692 (Del.Ch. Mar. 27, 2002).

35. *Id.*

36. My predecessor Chancellor Allen famously set forth both the standard applied to derivative litigation under Rule 12(b)(6) and its justification. "It is a fact evident to all of those who are familiar with shareholder litigation that surviving a motion to dismiss means, as a practical matter, that economically rational defendants (who are usually not apt to be repeat players in these kinds of cases) will settle such claims, often for a peppercorn and a fee. This fact causes one to apply the pleading test under Rule 12 with special care in such suits. The court cannot be satisfied with mere conclusions, as it might, for example, in an auto-accident case, because in this sort of litigation the risk of strike suits means that too much turns on the mere survival of the complaint." *Solomon v. Pathe Commc'ns Corp.,* 1995 WL 250374, at *4 (Del.Ch. Apr. 21, 1995), *aff'd,* 672 A.2d 35 (Del.1996).

As a practical matter, the Supreme Court has instructed this Court to give even closer scrutiny to challenges to the disinterestedness of a special litigation committee. *See Beam,* 845 A.2d at 1055.

37. Awards of other annual compensation, challenged in Counts II and V, were first awarded in 1997.

lacking independence for 12(b)(6) purposes, but would be given the benefit of the doubt under the stricter standard of Rule 23.1.

■ With that in mind, I turn to consider the sufficiency of plaintiffs' allegations against Tyson's directors. There is little doubt that Don Tyson is directly interested in almost all of the transactions questioned in the consolidated complaint. The sole objection raised by defendants involves related-party transactions benefiting directors who are not members of the Tyson family, such as Tollett's breeder hen research, Johnston's cold storage lease, or Massey's cattle purchases. At the time the complaint was filed, only Tollett was currently a director of the company. Defendants insist that demand is not excused with respect to these transactions because the complaint provides no reason to suspect that the Tyson family directors lacked independence from Massey, Tollett or, indeed, any director outside of the Tyson family.

Here defendants rely upon a formalistic and spiritless reading of past precedent to divide Delaware law from an obvious reality.[38] The Tyson family defendants focus upon their undoubted *independence*, when the issue is actually whether they "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders"[39]—in other words, are the Tyson family directors interested in such transactions? Plaintiffs' complaint in the present case presents a conspiracy-style theory of related-party transactions: the Tyson family's perquisites are alleged to be granted by other favored directors in exchange for their own favorable related-party transactions. Defendants ask us to believe that, despite the allegation that unearned benefits to non-Tyson family directors are the *quid pro quo* for approval of perquisites to the Tyson family, the latter would quite readily pursue a claim against the former.[40] Such an assertion goes against human nature and flies in the face of common sense. If the allegations in the complaint are true, then the Tyson family is interested in every related-party transaction, as these are the currency through which they in turn ensure their advantages.

**38.** Defendants rely upon *Brehm v. Eisner*, 746 A.2d 244, 257–58 (Del.2000) ("Because we hold that the Complaint fails to create a reasonable doubt that Eisner was disinterested in [the transaction], we need not reach or comment on" whether directors were beholden to Eisner) and *Rales v. Blasband*, 634 A.2d 927, 936 (Del.1993) ("Blasband must show that the directors are "beholden" to the Rales brothers or so under their influence that their discretion would be sterilized.").

**39.** *Rales*, 634 A.2d at 936.

**40.** Defendants dismiss allegations of a *quid pro quo* as "conclusory and unsupported." They do not challenge demand futility in connection with types of transactions in which Tyson family and non-family directors both had interests (*e.g.*, farm leases), and protest only related-party transactions of a different type (*e.g.*, poultry research). Defendants walk far too fine a line here. Even under Rule 23.1's heightened pleading standards, where plaintiffs allege a plethora of related-party transactions, it is reasonable to assume that *quid pro quo* transactions will not be limited merely to those of the very same specific order.

A related and somewhat stronger argument that defendants might raise is that the 2005 board could not be interested in transactions involving directors who had left the board at the time of the suit. Again, however, plaintiffs are entitled to the reasonable inference that so long as (a) the majority of the complaint rests against present directors, (b) the challenged transactions represent an alleged *quid pro quo* relationship and (c) current directors expect to retire from the board in the future, then the current directors will be interested in protecting the gains of former directors so that their own potential benefits are safeguarded in the future.

■ For purposes of demand, I will therefore consider both family and non-family transactions to be on the same footing. As to the former, defendants have virtually conceded that demand is futile. Don Tyson, Barbara Tyson and John Tyson are all either interested in each transaction or can be considered to lack independence by reason of consanguinity or marriage. Tollett's general partnership in the Tyson Family Partnership, as well as his alleged benefit from related-party transactions, suffices to create a reasonable doubt as to his independence, as does Bond's service as CEO, essentially at the pleasure of the Tyson family.[41] Every derivative count implicates either a member of the Tyson family or Tollett or Bond and, hence, plaintiffs raise a reason to doubt the disinterestedness and independence of the board, justifying excusal of demand with regard to the entire consolidated complaint.[42]

## V. STATUTE OF LIMITATIONS

■ Equity follows the law and in appropriate circumstances will apply a statute of limitations by analogy.[43] A three-year statute of limitations applies to breaches of fiduciary duty,[44] and the matter is properly raised on a motion to dismiss.[45] The statute of limitations begins to run at the time that the cause of action accrues, which is generally when there has been a harmful act by a defendant. This is true even if the plaintiff is unaware of the cause of action or the harm.[46]

■ Plaintiffs point to three justifications for tolling the statute of limitations that would allow me to consider an otherwise stale claim. Under the doctrine of inherently unknowable injuries, the statute will not run where it would be practically impossible for a plaintiff to discover the existence of a cause of action. No objective or observable factors may exist that might have put the plaintiffs on notice of

41. According to Tyson's 2004 proxy statement, Bond received a base salary of $943,615 and a bonus of $1.2 million in 2003. He is also one of the executives receiving the "other annual compensation" attacked in Count II. While the general Delaware rule holds that neither a director nor an executive appointed by a controlling shareholder are *per se* incapable of considering demand upon the company, where an executive's considerable salary is set by an otherwise dominated board, this Court may reasonably infer that a director-executive is dominated. *See In re Walt Disney Derivative Litig.*, 731 A.2d 342, 357 (Del.Ch.1998), *rev'd in part on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) (concluding two directors may be interested because their salaries set by the board exceeded their personal shareholdings). In this case, the value of Bond's shareholdings may well exceed the nominal value of his salary. However, other employees who have held Bond's role have gone on to receive partnerships in TLP, significant income from related-party transactions, and expanded "other" compensation. The value of these benefits to Bond—and the value to him of

continued good favor from the Tyson family— puts in doubt his independence from the Tyson family.

42. Once the interest of Tyson family directors is called into question, a doubt is raised as to the independence of other directors. For instance, with regard to Tollett's breeder hen research facility, Tollett may be considered directly interested, the Tyson family directors are interested due to the alleged *quid pro quo* relationships, and Bond's independence may be called into question as a result. Demand is thus excused.

43. *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *3 (Del.Ch. July 17, 1998).

44. 10 *Del. C.* § 8106.

45. *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4.

46. *See Isaacson, Stolper & Co. v. Artisan's Sav. Bank*, 330 A.2d 130, 132 (Del.1974); *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5.

an injury, and the plaintiffs bear the burden to show that they were "blamelessly ignorant" of both the wrongful act and the resulting harm.[47] Similarly, the statute of limitations may be disregarded when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth. Under this doctrine, a plaintiff must allege an affirmative act of "actual artifice" by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth.[48] Finally, the doctrine of equitable tolling stops the statute from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary. No evidence of actual concealment is necessary in such a case, but the statute is only tolled until the investor "knew or had reason to know of the facts constituting the wrong." [49]

■ Under any of these theories, a plaintiff bears the burden of showing that the statute was tolled, and relief from the statute extends only until the plaintiff is put on inquiry notice. That is to say, no theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong.[50] Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff

who was not or should not have been fooled.

■ One more complication emerges on a motion to dismiss an action as untimely: the evidence the Court is allowed to evaluate. If matters outside the complaint are to be considered by the Court, then this motion to dismiss is more properly treated as a motion for summary judgment, and the plaintiffs are entitled to conduct discovery.[51] Nevertheless, I may review two types of evidence, even if they are outside the four corners of the consolidated complaint, without converting the motion to one of summary judgment: (a) documents expressly referred to and relied upon in the complaint itself, and (b) documents that are required by law to be filed, and are actually filed, with federal or state officials.[52]

## VI. ANALYSIS

With these rules in mind, I turn to each of plaintiffs' claims. Where defendants have raised an objection on the grounds of the statute of limitations, I consider that argument first, and then move to consideration of the substantive merits of each claim.

### A. Count I: Consulting Contracts for Peterson and Don Tyson in 2001

#### 1. Statute of Limitations

■ Defendants are entitled to the protection of the statute of limitations with

**47.** *See In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5; *Ruger v. Funk*, 1996 WL 110072, at *2 (Del.Super.Jan. 22, 1996).

**48.** *See Ewing v. Beck*, 520 A.2d 653, 667 (Del. 1987); *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5; *Litman v. Prudential–Bache Props., Inc.*, 1994 WL 30529, at *4 (Del.Ch. Jan. 14, 1994); *Halpern v. Barran*, 313 A.2d 139, 143 (Del.Ch.1973).

**49.** *See In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6.

**50.** *Id.*

**51.** Ch. Ct. R. 12(b).

**52.** *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n. 28 (Del.2004) (holding that Court may take notice of documents filed with government officials according to requirements of federal and state law); *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 n. 46 (explaining that matters referred to and relied upon in a complaint may be considered on a motion to dismiss).

regard to the Tyson and Peterson contracts signed in 2001.[53] The company disclosed both contracts as part of SEC filings in December 2001. By waiting to file this action until February 16, 2005, plaintiffs have given up their right to all claims in Count I except those regarding the 2004 contract with Don Tyson.

Plaintiffs' arguments for tolling fall far short of the required standard. They admit that the contracts were disclosed to the public in late 2001, but insist that (a) the contracts required no actual work on the part of the consultants and (b) the fact that no services were required of Tyson or Peterson could not have been known until either no services were rendered (for instance, when Peterson died) or when the SEC discovered that the company's disclosures of Don Tyson's perquisites were inadequate.

I can quickly dispense with the allegation that neither Don Tyson nor Peterson was "required" to do any work under their contracts. Plaintiffs ceaselessly complain of Tyson's perfidy in describing the contracts as anything other than optional on the part of the consultants. They base this upon a single clause: "Executive may be required to devote up to twenty (20) hours per month to Employer."[54] More fully, however, both contracts provide:

> Services During the Term. During the Term, Executive *will,* upon reasonable request, provide advisory services to [the Employer] as follows: ... (b) Exec-

utive may *be required* to devote up to twenty (20) hours per month to Employer .... (d) Executive shall not be obligated to render services... during any period when he is disabled due to illness or injury, however Executive will continue to receive the benefits under Sections 3 and 4 of this Agreement.... [55]

This contract is clear on its face. In exchange for the salary specified in the contract, Tyson could *require* twenty hours of work per month from either consultant at its discretion. The fact that the contracts purchase, in essence, an option on the employees' time does not make them illusory, nor is the nature of the agreement obscure. If plaintiffs believed that these contracts were unfair, they could reasonably have been aware of their injuries in December 2001.

■■■ I am even less convinced as to plaintiffs' contention that they were unaware of the nature of Peterson's contract until he died. The consulting contracts clearly contemplate the payment of benefits to the spouses of either employee after their deaths. In essence, the company chose to internalize the provision of life insurance to employees. Even were plaintiffs to maintain that this payment constituted a pure waste of corporate assets, the relevant value for consideration would not be the *ex post* cost of benefits paid to Ms. Peterson after her husband's death, but the cost of the *risk* placed on the company at the time of the contract.[56] Plaintiffs

---

53. Count I involves three consulting contracts: two signed in 2001 employing Don Tyson and Peterson as consultants and a revised contract for Don Tyson signed in 2004. Defendants do not argue that the statute of limitations applies to the contract signed in 2004.

54. Consol. Compl. at ¶ 107; Defs.' Opening Br. in Supp. of Mot. to Dismiss Ex. E at 2. Although the quoted language is from Peter-

son's contract, Don Tyson's 2001 contract is substantially similar.

55. Defs.' Opening Br. in Supp. of Mot. to Dismiss Ex. E at 2 (emphasis added).

56. An employment contract does not constitute waste simply because it continues to pay benefits to the spouse of an employee after death. A corporation entering into such a contract merely takes upon itself the cost of

were on inquiry notice of this risk when Peterson signed his contract; his death gave the plaintiffs no new and relevant information.

Plaintiffs provide no valid reason why they could not have brought suit concerning the 2001 contracts in a timely fashion. Therefore, Count I of the complaint is time-barred as to the 2001 agreements.

### 2. Substantive Claims

■ Plaintiffs and defendants disagree as to whether the whole board approved the 2004 Don Tyson consulting contract or whether it was relegated to the Compensation Committee. On a motion to dismiss, I am bound by the well-plead accusations in the consolidated complaint, and these are unequivocal in suggesting that the whole board approved the contract. The fact that the complaint recognizes the existence of the Compensation Committee is not enough to contradict this assertion. Although the complaint and the associated proxies admit to the existence of a committee, defendants can point to no proxy that

suggests that the committee actually considered the 2004 consulting agreement. In the absence of such evidence, plaintiffs' allegation must stand and the whole board must be considered as proper defendants.

On this issue, the distinction is of little moment, however, as plaintiffs fail to state a claim either way. Plaintiffs' argument that the consulting contract constitutes little more than a gift fails for the reason discussed above: the fact that Don Tyson's hours were to be determined by Tyson itself does not mean the contract lacked consideration. No strained reading of clear contractual language can convert a purchased option into a gift. As the consulting agreement does not fall outside the bounds of business judgment, Count I can only withstand a motion to dismiss by sufficiently alleging that a majority of those who approved the transaction were dominated by or otherwise conflicted with respect to the recipient.[57] The only directors for which sufficient conflicts are alleged, however, are John Tyson, Bond, Tollett and Barbara Tyson. Defendants'

---

providing the employee with an insurance policy payable to the employee's spouse. As a matter of economics, there may be little significant difference between providing an employee with (a) an option for post-death payment of salary, (b) an equivalent life-insurance or annuity policy, or (c) a salary increase sufficient for the employee to buy such insurance on his or her own.

That plaintiffs gloss over this fact is understandable, as the complaint misstates the actual provisions of Peterson's contract when it alleges that "if Peterson died one day after he was awarded the consulting contract, Peterson's spouse would still be entitled to 10 years worth of payments and perquisites." Consol. Compl. at ¶ 111. That would be true if Tyson had purchased an assignable annuity for Peterson. In fact, Peterson's spouse would be entitled to *up to* 10 years of benefits under the contract, as the necessity for Tyson to pay terminates upon her death. As any actuary would recognize, the value of Peterson's con-

tract would depend greatly upon such factors as the age of Peterson's wife, her health, etc. Plaintiffs provide no such information, instead baldly asserting that the contract must be unfair because it pays out after death. That the contract internalizes risks—even extreme ones—does not come close to creating the suggestion of waste.

Nor would it be clear that Peterson's contract constituted waste if plaintiffs claimed that Peterson in fact did no work. (Plaintiffs imply, but do not make, such an accusation, and the silence is telling.) Peterson's consulting contract came only after a bitter disagreement over the sale of IBP, Peterson's former company. Defendants may very well have considered the non-compete provision of his consulting contract worth the bulk of its costs and valued the labor component very lightly. Such a decision would not be outside the bounds of business judgment.

57. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

only allegations against Hackley, Kever, Jones, Smith, Zapanta or Allen are that the board members are nominated at the behest of the Tyson family because of their voting control and that they have "demonstrated a consistent and unvaried pattern of deferring to anything the Tyson family wants, and of failing to exercise independent business judgment."[58] As to the first argument, it is well-settled that a director's appointment at the behest of a controlling shareholder does not suffice to establish a lack of independence.[59] Plaintiffs' remaining argument becomes wholly circular: in order to find that defendants lack independence, I must conclude that they failed to exercise independent business judgment by approving self-interested transactions; and yet in order to find those very transactions beyond the bounds of business judgment, I must conclude that the defendants lacked independence. Such a decision would be contrary to the presumption of business judgment that directors enjoy, however, and cannot be supported.

■ The consolidated complaint thus fails to allege that a majority of the entire board lacked independence.[60] Given that "a board's decision on executive compensation is entitled to great deference"[61] and that plaintiffs have failed to rebut the presumption of business judgment, the remainder of Count I must be dismissed for failure to state a claim.

**58.** Consol. Compl. at ¶ 146.

**59.** *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984); *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 356 (Del.Ch.1998).

**60.** Nor does the complaint allege that the decision to award the contract was less than unanimous, or that a majority of the six non-conflicted directors failed to approve the contract.

### B. Count II: Breach of Fiduciary Duty for Award of "Other Annual Compensation" in 2001

#### 1. Statute of Limitations

■ Defendants' objections based upon the statute of limitations extend only to "other annual compensation" paid in 2001, as the amounts of such compensation were disclosed in the proxy statement of Jan. 2, 2002.[62] Here plaintiffs may rely upon the doctrines of fraudulent concealment and equitable tolling. True, the proxy statement did disclose payments of "other annual compensation" to shareholders in early 2002, but according to the consolidated complaint, it did so by describing as business or travel expenses payments that could not be properly characterized as such. Plaintiffs had the right to rely upon fiduciaries to correctly categorize these payments, and at least as alleged, the mischaracterization would rise to the level of actual artifice. Hence, the first plaintiffs would have reason to know of this wrong would be upon learning of the SEC's investigation and its results in 2004. Thus the statute of limitations is tolled.

#### 2. Substantive Claims

■ Plaintiffs argue that defendant directors[63] breached their fiduciary duties in two separate ways. First, they argue that the approval of "other annual compensation" payments constituted a breach. Second, they maintain that defendant directors failed to disclose sufficient details

**61.** *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000).

**62.** Defs.' Opening Br. in Supp. of Mot. to Dismiss Ex. J. at 16.

**63.** Count II implicates defendant directors Don Tyson, John Tyson, Bond, Hackley, Kever, Jones, Tollett, Barbara Tyson, Starr, Massey, Wray, Johnston, and Allen.

regarding these payments, thus bringing an SEC investigation upon the company. The disclosure charge is analytically similar to that raised in Count V, and I will consider it there, leaving this section to concentrate on the approval of the disputed compensation.

■ Once again, plaintiffs and defendants disagree as to which body approved the other annual compensation payments, and in this Count the issue is a distinction with a difference. Plaintiffs' complaint as to the approval of the compensation amounts to a claim for excessive compensation. To maintain such a claim, plaintiffs must show either that the board or committee that approved the compensation lacked independence (in which case the burden shifts to the defendant director to show that the compensation was objectively reasonable), or to plead facts sufficient to show that the board or committee lacked good faith in making the award.[64] Assuming that this standard is met, plaintiffs need only allege some specific facts suggesting unfairness in the transaction in order to shift the burden of proof to defendants to show that the transaction was entirely fair.[65]

Which body approved the compensation is thus critical to plaintiffs' claim. Plaintiffs' allegations with regard to Compensation Committee members Allen, Hackley, Jones, Smith, and Massey fail for the reasons already outlined in Count I.[66] On the other hand, plaintiffs point to obvious conflicts with regard to Don Tyson, John Tyson, Barbara Tyson, Tollett and Bond, sufficient to challenge at least half of the entire board. Hence, Count II should survive a motion to dismiss only if I must credit the complaint's assertion that the entire board approved the decision. If the Compensation Committee made the decision, on the other hand, Tyson is entitled to dismissal of this Count.

So long as plaintiffs' position is not contradicted within the consolidated complaint or documents upon which it relies, at this stage I must accept plaintiffs' assertion that the compensation was approved by the entire board. I may not hold otherwise merely because plaintiffs concede the existence of a compensation committee and rely upon proxy statements that mention the Committee, as defendants wish me to do. Studying all relevant proxy statements relied upon by plaintiffs, it is impossible to find a reference that directly states that the compensation in question was approved by the committee. To take one example, the January 2, 2003 proxy statement includes a "Summary Compensation Table" that includes six types of compensation: salary, bonus, other annual compensation, options, restricted stock and all other compensation.[67] The report of the Compensation Committee in the same proxy, however, discusses salaries, bonuses, options and stock, but remains conspic-

---

64. *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 (Del.Ch.1996).

65. *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *4 (Del.Ch. Apr. 21, 1995), aff'd, 672 A.2d 35 (Del.1996).

66. *Aronson*, 473 A.2d at 815. Plaintiffs do include Massey as a director involved in related-party transactions dating from 2002 and 2003. Massey resigned from the Compensation Committee on August 2, 2002. Even given the extreme deference given to plaintiffs on a motion to dismiss, it would be unreasonable to challenge Massey's independence before his involvement in the sale of his farms. The complaint does not specify precisely when the other annual compensation was awarded in 2002 and, thus, I am forced to infer, at most, that Massey may have been interested over a period of eight months in 2002 before his resignation.

67. Defs.' Opening Br. in Supp. of Mot. to Dismiss Ex. K at 2.

uously silent about other annual compensation.[68]

It is thus reasonable to infer at this stage that the Compensation Committee did not approve or review the other annual compensation. Plaintiffs easily meet their further burden to allege some fact suggesting that the transactions were unfair to shareholders: the transactions and their related lack of disclosure undeniably exposed the company to SEC sanctions. Defendants misread *Solomon* to state that plaintiffs must show that the compensation itself was unreasonable in relation to similar companies in the industry. That the nature of the compensation was unfairly concealed from them is plainly sufficient.

Defendants' motion to dismiss Count II is therefore denied. I reiterate that at this stage in the litigation, I am required to give weight to plaintiffs' assertions regarding the body that approved the compensation, relying almost completely upon the statements of plaintiffs. The proxy statements are the only tangible evidence before me and they could be fairly read in favor of either party.

### C. Count III: Grant of Options Between 1999 and 2001

#### 1. Statute of Limitations

■ Plaintiffs urge this Court to conclude that no good faith challenge could be made to a spring-loaded option before 2003 because no diligent investor could have recognized the fortunate coincidence between stock-option grants and favorable news releases. The spring-loading of these option grants could only be discovered, according to plaintiffs, after investors were able to observe a pattern of opportune distributions. Defendants, on the other hand, assert that plaintiffs possessed every bit of information necessary to discover any alleged injury when the options were announced. All three options grants between 1999 and 2001 were listed in Tyson's proxy statements, and all three grants accurately included the number of shares granted, the exercise price, and the date of the grant. To defendants, any shareholder could have compared the stock option award with the year's news clippings and realized that, for instance, the 1999 options had been granted the day before Tyson announced the sale of the Pork Group for $80 million. Two questions thus present themselves. First, have plaintiff alleged facts sufficient to suggest that the statute of limitations is be tolled? Second, did Tyson's disclosure of the mere date and price of the grants, without more, suffice to put plaintiffs on inquiry notice?

Assuming every fact in the consolidated complaint to be true, plaintiffs amply demonstrate that the doctrines of equitable tolling and fraudulent concealment toll the statute of limitations. Plaintiffs allege that defendants knowingly spring-loaded options to key executives and directors while maintaining in public disclosures that such options were issued at market rates. Such partial, selective disclosure—if not itself a lie, certainly exceptional parsimony with the truth—constitutes an act of "actual artifice" that satisfies the requirements of the doctrine of fraudulent concealment. Even were this not the case, defendants' roles as fiduciaries would justify tolling the statute of limitations through the doctrine of equitable tolling. Plaintiffs were entitled to rely upon the competence and *good faith* of those protecting their interests.[69] It is difficult to conceive of an instance, consistent with the concept of loyalty and good faith, in which a fiduciary may de-

68. *Id.* at 16–19.

69. *See In re Dean Witter P'ship Litig.,* 1998 WL 442456, at *6.

clare that an option is granted at "market rate" and simultaneously withhold that both the fiduciary and the recipient *knew* at the time that those options would quickly be worth much more. Certainly at this stage of the litigation, plaintiffs are entitled to the reasonable inference of conduct inconsistent with a fiduciary duty.

Similarly, it would be inappropriate to infer that plaintiffs were on inquiry notice of injury simply because some relevant information was in the public domain. Certainly, investors are under an obligation to exercise reasonable diligence in their affairs, and no succor from the statute of limitations should be offered a dilatory plaintiff in the absence of such care.[70] Yet it would be manifest injustice for this Court to conclude, as a matter of law, that "reasonable diligence" includes an obligation to sift through a proxy statement, on the one hand, and a year's worth of press clippings and other filings, on the other, in order to establish a pattern concealed by those whose duty is to guard the interests of the investor.

The consolidated complaint contains allegations sufficient to justify tolling the statute of limitations, at least for purposes of a motion to dismiss. At trial, defendants will have the opportunity to present evidence to show that plaintiffs were, in fact, on inquiry notice. For instance, defendants might establish that financial analysts, institutional investors, or academic researchers had published research suggesting that Tyson's directors favorably timed option grants long before the consolidated complaint was filed. I may not infer such knowledge at this point in the proceedings, however.

### 2. Substantive Claims

■ Plaintiffs concede that the sole authority to grant these options rested in the Compensation Committee, but argue that the entire board may be challenged because the Committee was required to consider the recommendations of the Chairman and Chief Executive Officer, each of whom were recipients of options themselves. This argument is inconsistent with Delaware law.

■ A committee of independent directors enjoys the presumption that its actions are *prima facie* protected by the business judgment rule.[71] That the Committee was required to consult with other corporate officers is irrelevant: the committee admittedly retained independent authority and discretion to approve or modify whatever it received as a recommendation. Plaintiffs' complaint should properly target only the members of the compensation committee at the time the options were approved: Vorsanger, Massey, Cassady, Allen, Hackley, Jones and Smith.[72]

■ As plaintiffs' allegations against these directors are insufficient to suggest

---

**70.** *Id.*

**71.** *Nomad Acquisition Corp. v. Damon Corp.,* 1988 WL 383667, at *6 (Del.Ch. Sept.20, 1988).

**72.** Although Count III is dismissed except with regard to these seven defendants, none of whom are alleged to have received any financial benefit through the grant of spring-loaded options, the other defendant directors may yet be affected indirectly. Not all acts of disloyalty or bad faith will directly benefit the malefactor, and a director may be held personally liable for a breach of the duty of loyalty in the absence of a personal financial gain. Where the beneficiary of disloyalty is not directly liable for losses, that beneficiary might still be found to retain "money or property of another against the fundamental principles of justice or equity and good conscience," and thus to be unjustly enriched. *Schock v. Nash,* 732 A.2d 217, 232–233 (Del. 1999).

a lack of independence, plaintiffs must demonstrate that the grant of the 2003 options could not be within the bounds of the Compensation Committee's business judgment. A severe test faces those seeking to overcome this presumption: "[W]here a director is independent and disinterested, there can be no liability for corporate loss, unless the facts are such that no person could possibly authorize such a transaction if he or she were attempting in *good faith* to meet their duty." [73]

Whether a board of directors may in good faith grant spring-loaded options is a somewhat more difficult question than that posed by options backdating, a practice that has attracted much journalistic, prosecutorial, and judicial thinking of late.[74] At their heart, all backdated options involve a fundamental, incontrovertible lie: directors who approve an option dissemble as to the date on which the grant was actually made. Allegations of springloading implicate a much more subtle deception.[75]

Granting spring-loaded options, without explicit authorization from shareholders, clearly involves an indirect deception. A director's duty of loyalty includes the duty to deal fairly and honestly with the shareholders for whom he is a fiduciary.[76] It is inconsistent with such a duty for a board of directors to ask for shareholder approval of an incentive stock option plan and then later to distribute shares to managers in such a way as to undermine the very objectives approved by shareholders. This remains true even if the board complies with the strict letter

---

73. *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052–1053 (Del.Ch.1996) (emphasis added).

74. In a paradigmatic backdating scenario, a company issues stock options to an executive on one date while providing false documentation to show that the options were actually issued earlier, thus granting the executive an "in the money" option. Of the many reasons proposed for director's willingness to backdate options, favorable tax treatment, fairness among successively-hired employees, or shareholder-approved rules requiring at-market options are often mentioned. *See* David I. Walker, *Some Observations on the Stock Options Backdating Scandal of 2006* 1–6 (Boston Univ. Sch. of Law Working Paper Series, Law And Economics, Paper No. 06–31, 2006), *available at* http://ssrn.com/abstract=929702. Although similar to spring-loading, the backdating of options always involves a factual misrepresentation to shareholders. Issuance of options in conjunction with such deception, and against the background of a shareholder-approved stock-incentive program, amounts to a disloyal act taken in bad faith. *See Ryan v. Gifford,* 918 A.2d 341, at 357–58, 2007 WL 1018208 at *11 (Del.2007).

75. The touchstone of disloyalty or bad faith in a spring-loaded option remains deception, not simply the fact that they are (in every real sense) "in the money" at the time of issue. A board of directors might, in an exercise of good faith business judgment, determine that in the money options are an appropriate form of executive compensation. Recipients of options are generally unable to benefit financially from them until a vesting period has elapsed, and thus an option's value to an executive or employee is of less immediate value than an equivalent grant of cash. A company with a volatile share price, or one that expects that its most explosive growth is behind it, might wish to issue options with an exercise price below current market value in order to encourage a manager to work hard in the future while at the same time providing compensation with a greater present market value. One can imagine circumstances in which such a decision, were it made honestly and disclosed in good faith, would be within the rational exercise of business judgment. But the facts alleged in this case are different.

76. *In re Walt Disney S'holder Derivative Litig.*, 907 A.2d 693, 755 (Del.Ch.2005) ("To act in good faith, a director must act at all times with an *honesty of purpose* and in the best interests and welfare of the corporation." (emphasis added)).

of a shareholder-approved plan as it relates to strike prices or issue dates.

██ The question before the Court is not, as plaintiffs suggest, whether spring-loading constitutes a form of insider trading as it would be understood under federal securities law.[77] The relevant issue is whether a director acts in bad faith by authorizing options with a market-value strike price, as he is required to do by a shareholder-approved incentive option plan, at a time when he *knows* those shares are actually worth more than the exercise price. A director who intentionally uses inside knowledge not available to shareholders in order to enrich employees while avoiding shareholder-imposed requirements cannot, in my opinion, be said to be acting loyally and in good faith as a fiduciary.

██ This conclusion, however, rests upon at least two premises, each of which should be (and, in this case, has been) alleged by a plaintiff in order to show that a spring-loaded option issued by a disinterested and independent board is nevertheless beyond the bounds of business judgment. First, a plaintiff must allege that options were issued according to a shareholder-approved employee compensation plan.[78] Second, a plaintiff must allege that the directors that approved spring-loaded (or bullet-dodging) options (a) possessed material non-public information soon to be released that would impact the company's share price, and (b) issued those options with the intent to circumvent otherwise valid shareholder-approved restrictions upon the exercise price of the options. Such allegations would satisfy a plaintiff's requirement to show adequately at the pleading stage that a director acted disloyally and in bad faith and is therefore unable to claim the protection of the business judgment rule. Of course, it is conceivable that a director might show that shareholders have expressly empowered the board of directors (or relevant committee) to use backdating, spring-loading, or bullet-dodging as part of employee compensation, and that such actions would not otherwise violate applicable law. But defendants make no such assertion here.

Plaintiffs' have alleged adequately that the Compensation Committee violated a fiduciary duty by acting disloyally and in bad faith with regard to the grant of options. I therefore deny defendants' motion to dismiss Count III as to the seven members of the committee who are implicated in such conduct.

### D. Count IV: Related Party Transactions

Plaintiffs include in their complaint related-party transactions taken from proxy

---

77. Pls.' Answering Br. in Opp'n to Mot. To Dismiss at 13. Academic commentary on the relationship between spring-loading and insider trading is decidedly mixed. *See, e.g.,* Victor Fleischer, *Options Backdating, Tax Shelters, and Corporate Culture* 9 n. 27 (Univ. of Colo. Legal Studies Working Paper Series, Working Paper No. 06–38, 2006), *available at* http://ssrn.com/abstract=939914; Stephen Bainbridge, Spring-loaded Options and Insider Trading, on ProfessorBainbridge.com, http://www.professorbainbridge.com/2006/07/springloaded_op_1.html (July 10, 2006) (presenting argument of Iman Anabtawi that spring-loaded options constitute a form of insider trading or breach of fiduciary duty);

Larry E. Ribstein, Options and Insider Trading, on Ideoblog, http://busmovie.typepad.com/ideoblog/2006/07/options_and_ins.html (July 11, 2006) (refuting Anabtawi's insider trading argument).

78. Shareholder approved employee compensation plans are common partially as a result of I.R.C. § 162(m), the section of the tax code that allows a business to deduct employee compensation above $1 million only if it qualifies as performance-based compensation. Performance-based compensation plans must be approved by a majority vote of shareholders. *See* I.R.C. § 162(m)(4)(C)(ii).

statements covering the period between 1998 to 2004. Plaintiffs insist that these transactions were entered into for the purposes of enriching the Tyson family and other insiders. Before looking at the merits of the complaint, however, it is first necessary to address the statute of limitations.

### 1. Statute of Limitations

■ Plaintiffs admit that many of the related-party transactions were revealed in Tyson's proxy statements. Amalgamated brought substantially the same complaint with regard to these transactions in 2004 without the benefit of Meyer's books and records request. Given these facts, there cannot be much doubt that plaintiffs were on inquiry notice.[79] Plaintiffs are caught on the horns of a dilemma. Either Amalgamated raised a claim on February 16, 2005 without sufficient knowledge (thus violating, among other things, Rule 11), or the fact that Amalgamated filed its complaint serves to show that any plaintiff would have been on inquiry notice at that point.

To the extent that the company disclosed that it was involved in related-party transactions, it can hardly be said that Tyson shareholders were not on notice. Shareholders in the course of ordinary dili-

gence, particularly through demands for records under § 220, should have been able to discover their harm from the moment the related-party transactions were revealed. Thus, Count IV must be dismissed with regard to all transactions revealed in proxies before February 16, 2002.

### 2. Substantive Claims

■ Two distinct parts of Count IV remain vital, however, and must be considered. First, the statute of limitations does not cover related-party transactions not revealed to the public.[80] For instance, the relationship between Tyson and its logo vendor, allegedly ongoing since 2001, seems *not* to have been disclosed in proxy statements. Second, the statute of limitations would not apply to transactions entered into after February 16, 2002. In considering the substantive question, the remaining transactions can be usefully separated into those that both parties agree were reviewed by some form of governance committee, and those that plaintiffs insist were never reviewed at all.[81]

#### a. Transactions Admittedly Reviewed by an Independent Committee

■ I apply the standard *Aronson* analysis to those transactions admittedly

---

**79.** Plaintiffs incorrectly suggest that the doctrine of fraudulent concealment tolls the statute of limitations until plaintiffs actually discover the facts giving rise to claims, citing a Superior Court case, *Wright v. Dumizo*, 2002 WL 31357891, at *3 (Del.Super.Oct. 17, 2002). The Superior Court in *Wright*, faced with a case in which the plaintiff had actually discovered wrongdoing, applied the law relevant to the case at hand and only paraphrased the more complete rule of *Giordano v. Czerwinski*, 216 A.2d 874, 876 (Del.1966). In *Giordano*, the Supreme Court was quite clear: "[W]hile the Statute of Limitations may not apply when the acts complained of are fraudulently concealed from the plaintiff, such application is suspended only until his rights are discovered or *could have been discovered by*

*the exercise of reasonable diligence." Id.* at 876 (emphasis added).

**80.** The complaint mentions only that transactions were disclosed through proxy statements. Defendants will of course have the opportunity to show at trial that information had been released to the public through other means (*e.g.,* press releases, website disclosures).

**81.** Over the period in question, related-party transactions were either reviewed by the Special Committee or the Governance Committee. For simplicity, I refer to these both as the "independent committees."

reviewed by a special committee. Plaintiffs have already failed to challenge the disinterestedness and independence of the special committee.[82] The next question is whether the transactions are outside the bounds of business judgment: does the complaint allege sufficient facts from which I may infer that the board knew that material decisions were being made without adequate deliberation in a manner that suggests that they did not care shareholders would suffer a loss?[83] This is a scienter-based test, and the complaint must allege not only that the directors were incorrect in their assessment at the time but that they either intended to harm shareholders, or at least were absolutely careless in the matter.

■ This is a high hurdle, and plaintiffs do not come near to reaching it. The complaint must allege that the directors "consciously and intentionally disregarded their responsibilities."[84] Here plaintiffs rely upon my decision in *iXCore, S.A.S. v. Triton Imaging, Inc.*, where I stated that a complaint may remove the presumption of business judgment where it "may indicate a violation of the fiduciary duty of care in considering all material information

reasonably available before making a business decision...."[85] Plaintiffs suggest that the meager materials they received in response to their § 220 request justifies the conclusion that "the [independent committees'] work was cursory at best and, at worst, a mere whitewash designed to deceive shareholders into believing that the company had exercised some level of control...."[86]

■ The consolidated complaint offers up few facts in support of those conclusions, however. There is an important distinction between an allegation of non-deliberation and one of inadequate deliberation.[87] It is easy to conclude that a director who fails to consider an issue at all has violated at the very least a duty of due care. In alleging inadequate deliberation, however, a successful complaint will need to make detailed allegations with regard to the process by which a committee conducted its deliberations: the amount of time a committee took in considering a specific motion, for instance, or the experts relied upon in making a decision.[88] The consolidated complaint mentions none of these things, instead urging that defendants' bad faith is obvious due to the sheer volume of

---

**82.** The consolidated complaint makes only one serious attempt to convince this Court that a member of the independent committees, defendant Massey, was interested, and this because of a single related-party transaction. Plaintiffs urge me to find that the other directors must have been interested simply because no disinterested director might have approved the long list of transactions in the complaint. This circular reasoning once again fails to convince.

**83.** *Official Comm. of Unsecured Creditors of Integrated Health Servs.*, 2004 WL 1949290, at *10 (Del.Ch. Aug. 24, 2004) (quoting *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del.Ch.2003)).

**84.** *In re Walt Disney Co. Derivative Litig.*, 825 A.2d at 289.

**85.** 2005 WL 1653942, at *1 (Del.Ch. July 8, 2005).

**86.** Pls. Answering Br. in Opp'n to Mot. to Dismiss at 40.

**87.** *See Official Comm. of Unsecured Creditors of Integrated Health Servs.*, 2004 WL 1949290, at *12 n. 58.

**88.** The complaint does allege that an independent committee met only once a year, despite requirements in their charter that they meet more often. This is not enough for a court to infer, however, that the transactions were given only cursory review. A decision to change the scheduling of meetings does not require the conclusion that those meetings were ineffective or that the directors in attendance were insincere.

transactions challenged.[89] Not only would such a conclusion be contrary to Delaware law, it is also contrary to judicial policy, as it encourages complaints covering lengthy historical periods with scant evidentiary weight. Count IV, therefore, must be dismissed for failure to state a claim with regard to any transaction admittedly reviewed by an independent committee.[90]

### b. Transactions Allegedly not Reviewed by an Independent Committee

 Count IV actually hits its mark with respect to transactions after 2002 (or not revealed in proxy statements before that date) that are alleged by plaintiffs not to have been reviewed at all. As the majority of the Tyson board can be considered interested at all relevant times, transactions not sterilized by independent review receive no protection from the business judgment rule, and plaintiffs must only allege that the transactions were in some way unfair to shift the burden upon the defendants to prove their entire fairness.[91] By the terms of the *Herbets* settlement, all related-party transactions were required to be reviewed. The fact that they allegedly were not is sufficient for me to infer that, at least in the context of this case, the transaction may have escaped oversight for a reason.

**89.** The complaint attempts to conjure a suggestion of bad faith from a total of approximately $163 million worth of related-party transactions, on the one hand, and specific allegations regarding the Arnett Sow Complex, the Tyson Children's Partnership Leases, and the grow-out transactions. Despite plaintiffs' best attempt to characterize the three specific transactions as beyond the possible bounds of business judgment, each is amenable to reasonable explanation. For instance, plaintiffs point to a reduction in the lease rates paid to the Arnett Sow Complex by 42.5%, rather than the 85% requested by the Pork Group, as somehow *per se* unfair. I have no reason to infer, however, that the Pork Group's recommendation lacked self-interest or was even reasonable, and in any event the law places the duty to make such a decision in the hands of Tyson's directors, not the Pork Group's. Nor are the lease rates paid by Tyson to the Tyson Children's Partnership so inherently high that this Court may conclude that no director could in good faith approve the transaction.

Particularly confusing is plaintiffs' insistence that "[t]here is no valid business reason for selling . . . insiders [Tyson's] raw materials and everything needed to develop it, and then turning around and buying the finished product from them at a higher price. . . ." Consol. Compl. at ¶ 76. First, the *Herbets* settlement not only specifically countenances the continuation of grow-out transactions, but also provides for rates at which profits may be split between Tyson and corporate insiders. Second, the obvious purpose of grow-out transactions is to shift the risk of production failure outside Tyson itself. The many tragedies that may adhere between egg and broiler hen— incidence of avian flu, alteration to regulations regarding the raising of poultry, etc.— become the concern of the contractor, who is presumably paid a premium to accept those risks.

**90.** The consolidated complaint concedes that an independent committee did review the following transactions: farm leases with Johnston & Starr and waste-water treatment plant leases with Don Tyson (1998); a farm lease with the John and Helen Tyson Estate; payments to Tollett's breeder hen research facility, and an office space lease from a company partially owned by Starr and John Tyson (1999); farm leases with John Tyson and the Randal Tyson Trust, the Tyson Children's Partnership, Tollett, Johnston, Don Tyson, the Randal Tyson Trust, and entities related to Starr, as well as the Arnett Sow Complex lease (2000); an aircraft lease with Tyson Family Aviation (2001); farm leases with the John Tyson and Randal Tyson Trust, Joe Starr and the children of Don Tyson, the Tyson Children's Partnership, JHT LLC, and Tollett, as well as payments to Tollett's breeder hen research facility, contracts with Don Tyson's waste water plants, and the office space lease with Starr and John Tyson (2004).

**91.** *See Solomon v. Pathe Commc'ns Corp.,* 1995 WL 250374, at *5 (Del.Ch. Apr. 21, 1995), *aff'd,* 672 A.2d 35 (Del.1996).

Count IV, however, is dismissed except with respect to this relatively narrow class of claims.

### E. Count V: Breach of Fiduciary Duty for Inadequate Disclosure of Perquisites Leading to SEC Sanctions and Fines

Before I may properly consider Count V, it is necessary to decipher from the complaint its actual scope. According to the consolidated complaint, "Defendants breached their fiduciary duties to Tyson by engaging in a consistent pattern and practice of neglect, which resulted in disclosure violations that exposed the company to SEC sanctions and fines, including, but not limited to failures to disclose amounts of 'other compensation,' amounts of 'travel and entertainment' expenses paid to executives by the company and amounts paid in related-party transactions." [92] Count V is further targeted at "inadequate, incomplete, or no disclosures regarding large amounts of executive compensation, which any reasonable Board member would have adequately investigated and would have adequately disclosed." [93] Yet, puzzlingly, neither the SEC investigation nor the allegations describing it in the complaint say anything about related-party transactions or executive compensation in general. Rather, they focus entirely on Don Tyson's perquisites.

 Plaintiffs seem to believe that any or all alleged malfeasance by the defendants may somehow be shoehorned into a disclosure claim because *anything* that defendants failed to disclose "exposed" Tyson to SEC scrutiny. Disclosure claims do not allow so broad a target. For a disclosure claim to be viable, it must demonstrate damages that flow from the failure to adequately *disclose* information, not that the information disclosed concerned matters for which damages are appropriate. [94] Plaintiffs must at the very least allege some connection between the lack of disclosure and an actual harm. [95] Exposure to risk of investigation does not suffice. Attempting to expand the concept of harm to include the "risk" of investigation represents a triumph of imagination, but little else.

Other than Don Tyson's perquisites, which resulted in SEC penalties, plaintiffs make no showing of damage from failure to disclose any form of excessive compensation. Therefore, Count V fails to state a claim regarding all matters not relating to the SEC settlement.

 Allegations regarding the disclosure violations stemming from Don Tyson's perquisites, on the other hand, will not be dismissed. Defendants rely upon Tyson's exculpatory provision under § 102(b)(7), which releases directors from liability for breaches of the duty of care. It is not clear, however, that the duty of care is at issue here. Disclosure violations may, but do not always, involve violations of the duty of loyalty. [96] A decision violates only the duty of care when the misstatement or omission was made as a result of a director's erroneous judgment with regard to the proper scope and content of disclosure, but was nevertheless made in good faith. [97] Conversely, where there is reason

---

**92.** Consol. Compl. at ¶ 190.

**93.** *Id.*

**94.** *Brown v. Perrette,* 1999 WL 342340, at *6 (Del.Ch. May 14, 1999).

**95.** *Loudon v. Archer–Daniels–Midland Co.,* 700 A.2d 135, 147 (Del.1997).

**96.** *Orman v. Cullman,* 794 A.2d 5, 40–41 (Del. Ch.2002).

**97.** *Id.* at 41.

to believe that the board lacked good faith in approving a disclosure, the violation implicates the duty of loyalty.

It is too early for me to conclude that the alleged failures to disclose do not implicate the duty of loyalty. As stated in my discussion of Count II, I must accept as true that the "other annual compensation" was approved by the entire board, as there is nothing in the proxy statements to affirmatively suggest that it was considered by the compensation committee. Furthermore, the entire board approved the proxy statements later condemned by the SEC. Since 2001, the board of directors included Don Tyson, Barbara Tyson, John Tyson, Tollett and Bond.[98] Where the independence of a majority of the board can be questioned, I cannot determine as a matter of law that a disclosure violation was solely a violation of the duty of care.[99]

As a consequence of this narrowing of plaintiffs' scattershot allegations, Count V applies only to disclosure violations that culminated in the 2005 settlement with the SEC. Additionally, as this settlement covered the years 1997 to 2003, this count should be dismissed in its entirety with regard to defendant Zapanta (appointed to the board in 2004).

### F. Counts VI and VII: Breaches of Contract and Contempt Prior to 2002

Counts VI and VII address the responsibilities of the Tyson directors who entered into the *Herbets* settlement. Plaintiffs seek to enforce the settlement under one of two theories. Count VI maintains that the directors have breached a contractual duty. In the alternative, Count VII asks that I impose sanctions against the defendants for violating an Order of this Court. Both counts present procedural challenges that highlight a paradox of the derivative complaint. Shareholders bring suit on behalf of a corporation, but the corporation is also a party to most settlements. When a director later breaches such a settlement, who has the ability to bring an action on behalf of the shareholders to enforce the agreement, and how may it be done? The underlying allegations in both counts are the same: the directors failed to ensure that all related-party transactions were reviewed by a special committee and failed to review Don Tyson's perquisites.

### 1. Procedural Issues for Contempt Under Rule 70(B)

■ Plaintiffs' motion for contempt is procedurally improper and may be easily dismissed. Defendants urge that there is no cause of action for civil contempt, citing an opinion of the 7th Circuit,[100] but there is no need to go so far afield for guidance. The contempt powers of Delaware courts are indeed broad, and "the protean force of equity has not been spent" in this jurisdiction: this Court retains the power to fashion remedies "where justice requires

---

**98.** Bond was appointed to the Tyson board in 2001. For periods before 2001, Starr's membership on the board suffices to suggest a conflict of interest between Starr and Tyson. According to the complaint, Starr was involved in approximately $18 million of related-party transactions with Tyson between 1998 and 2004.

**99.** *Orman*, 794 A.2d at 41 ("Unfortunately for the defendants, however, because Orman has pled facts which make it reasonable to question the independence and disinterest of a majority of the Board that decided what information to include in the Proxy Statement, I cannot say, as a matter of law, that the complaint unambiguously states only a duty of care claim.").

**100.** *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir.1993).

and the law is silent." [101] Nevertheless, I need only exercise this power where the law is actually *silent* and no just remedy available. The rules of the Court of Chancery speak directly to the matter of contempt:

> "For failure to ... obey or perform any order, an attachment may be ordered by the Court *upon a filing in the cause* of an affidavit ... setting forth the facts constituting the disobedience." [102]

Plaintiffs' proper recourse with regard to contempt would be to file a motion to show cause in the earlier case. Given the peculiar nature of derivative complaints, in which a corporation is both a nominal defendant and the entity on whose behalf damages are sought, plaintiffs are arguably already parties to the earlier case. Even were this not true, Rule 71 provides that an order made in favor of a person not a party to an action may be enforced "by the same process as if that person were a party." [103] Plaintiffs face no impediment in pursuing contempt and, thus, there is no particular reason for this Court to craft for them a peculiar equitable remedy. Count VII must be dismissed.

### 2. Breach of Contract Claim for a Settlement in a Derivative Action

 If plaintiffs' contempt claim is procedurally improper, it is equally true that there is no Delaware authority barring the enforcement of a settlement agreement through an action for breach of contract. Defendants may be correct in describing as "bizarre" [104] a process by which a plaintiff may assert rights under a contract on behalf of the company when the company itself did not fulfill its responsibility. But such an action is no more unusual than the derivative lawsuit itself. The *Herbets* settlement, although embodied in a court order, represented an agreement between the company and its shareholders, on the one hand, and the company as embodied in its board, on the other. That settlement, entered into by a minority shareholder on behalf of the company, should be enforceable by another minority shareholder. To object that plaintiffs in the two actions have differing names would reduce the institution of derivative litigation to a rigid formalism.

Similarly, the fact that the settlement was adopted as a court order makes it no less enforceable as a contract. While there is authority for the proposition a Delaware court cannot enforce a settlement through contempt unless it is adopted as part of an order, [105] defendants point to no authority to suggest that once adopted contempt becomes the *only* remedy for violation. Nor is there any need to create such a rule.

### 3. Violations of the *Herbets* Settlement

I must still determine whether the complaint alleges a claim for breach of contract. Count VI asserts that defendants violated the *Herbets* settlement in three ways: through a failure to review annually the related-party transactions; through a failure to review the annual expenses submitted by Don Tyson; and finally, through

---

**101.** *Parsons v. Mumford,* 1989 WL 63899, at *1–2 (Del.Ch. June 14, 1989).

**102.** Ch. Ct. R. 70(b) (emphasis added).

**103.** Ch. Ct. R. 71.

**104.** Defs.' Opening Br. in Supp. of Mot. to Dismiss at 45.

**105.** *Read v. Wilmington Senior Ctr., Inc.,* 1992 WL 296870, at *1 (Del.Ch. Sept. 16, 1992) (recounting that Read had failed in the Court of Common Pleas to enforce an action for contempt because the settlement had not been incorporated into an order).

a failure to keep track of the use of the Tyson boat.[106] Two issues remain: first, are plaintiffs barred by the statute of limitations, and second, do they present a claim for which relief may be granted?

■ With regard to the statute of limitations, there is no reason to suspect that plaintiffs were on inquiry notice before the SEC investigation. Where plaintiffs have relied upon a fiduciary's statements (such as proxy statements) attesting that all related-party transactions were reviewed, they are not on inquiry notice of the harm done to them unless they had some reason to suspect that the information upon which they relied was inaccurate. Defendants assured shareholders in their proxy statements that related-party transactions and Don Tyson's perquisites were disclosed and reviewed. The SEC now insists that this was incorrect, but there is no indication in the record that investors should have known of the dissembling before the SEC uncovered it.

■ As to the substantive issue, plaintiffs have certainly put forward facts sufficient to suggest that defendants breached their contract made with shareholders in 1997. The complaint suggests strongly that not all of Don Tyson's perquisites, nor many related-party transactions, were actually reviewed. If nothing else, the SEC investigation provides a very strong inference.[107] Defendants protest that no such review was required, and that no breach can be found in "the alleged fact that the Compensation Committee did not review every detail of every expense item submitted by Don Tyson, but instead created procedures for others to do so." [108] This directly contradicts the settlement language. Nothing in *Herbets* suggests that directors are *entitled* to establish such procedures. The *Herbets* case, like this one,

---

**106.** Plaintiffs include the grow-out operations as related-party transactions under Count IV, and maintain that "neither the Board nor its Committees reviewed whether Tyson was receiving a fair price from the Tyson insiders at the front end of these arrangements, or whether it was paying a fair price when buying the livestock back at the end." Consol. Compl. at ¶ 77. Plaintiffs' allegations, if true, would seem to implicate an additional condition of the *Herbets* settlement not included in the complaint: "In any further livestock and feed sale and repurchase transactions between the Company any directors [sic], officers or their affiliates, the profits, if any, in excess of the Company's short-term borrowing rate will be shared between the Company (75%) and the individual (25%)." As the issue has not been brought before the Court, I do not consider it here.

**107.** Defendants make some attempt at distinguishing the expense payments to Don Tyson before his retirement and the payments to Don Tyson as a result of his consulting contract after his retirement, an exercise that brings to light an interesting fact. The 2001 Don Tyson and Peterson contracts are almost entirely identical. However, Peterson's contract (which has no bearing on the *Herbets*

settlement) entitles him to "reimbursement for reasonable out of pocket expenses." Don Tyson's contract is conspicuously silent on the issue of "expenses," instead entitling him to "travel and entertainment costs."

The *Herbets* settlement, on the other hand, makes no reference to the position Don Tyson occupies, inside or outside of Tyson's organizational structure. It instead requires that a committee review all "expense reimbursements" to him as an individual. Defendants nevertheless wish me to infer that any payments to Don Tyson after his retirement are outside the scope of the settlement: Tyson was being reimbursed, after all, not for "expenses" but for "costs."

I decline to take such a narrow view of the agreement, at least at this stage. I cannot imagine that the strictest of formalists would comb through words as defendants suggest, allowing directors to escape the terms of a settlement agreement by making payments consistent with past practices but distinguished by the granting of a new name.

**108.** Defs.' Opening Br. in Supp. of Mot. to Dismiss at 47.

alleged that interested Tyson directors and management are working primarily for the benefit of the Tyson family. Shareholders agreed to a settlement that provided them with protection from future abuse through the oversight of independent directors. If Tyson's directors instead chose to delegate their contractual duties to others, they did so against the terms of the agreement and at their own peril. Reading the settlement to allow the independent board to devolve its review responsibilities to management led by John Tyson would give new meaning to allowing the fox to guard the henhouse.

 Finally, defendants attempt to recharacterize Count VI as a fiduciary duty claim in order to draw themselves within the protection of the Tyson exculpatory clause. Count VI and Count IV do draw upon substantially the same facts, but they are two separate causes of action. A director might well breach a contract without violating any fiduciary duty.[109] Similarly, a director can behave utterly disloyally while attending to the terms of a contract. Tyson's 102(b)(7) provision only exculpates a director from liability for breaches of fiduciary duty, and therefore is of no relevance to Count VI.

Assuming (as I must) the truth of all factual allegations, Count VI thus states a claim for which relief may be granted.

### G. Count VIII: Material Misrepresentations in the 2004 Proxy Statement

Count VIII converts plaintiffs' grievances over related-party transactions and misrepresentations regarding other annual compensation into a class action claim for misrepresentation in Tyson's 2004 proxy statement. Plaintiffs theorize that had Tyson's management faithfully disclosed information regarding these transactions, shareholders might not have voted to elect the directors and, therefore, seek nominal damages to recompense them for their right to cast a fully-informed vote as well as disgorgement of "all ill-gotten gains" received by the directors elected in 2004. Defendants protest, *inter alia*, that the claim presented is not direct but derivative, that the issue of the 2004 elections have been mooted by subsequent events, and that damages are inappropriate in the context of an election for directors. I will deal with these arguments in order.

 The Supreme Court recently has determined that the proper analysis of direct and derivative claims centers on two questions: who has suffered the alleged harm, and who would receive the benefit of any remedy that a court would impose?[110] For a shareholder (or, as here, a class of shareholders) to maintain a direct claim, he or she must identify an injury that is not dependent upon injury to the corporation. To put it another way, plaintiffs must demonstrate that "considering the nature of the wrong alleged and the relief requested . . . he or she can prevail without showing an injury to the corporation. . . ."[111] In a very limited sense, plaintiffs have succeeded.

 Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote-the harm suffered is almost always an individual, not corporate, harm.

---

109. Indeed, to the extent that a contract may be rationally and efficiently breached, a director might believe that he is *obligated* by his fiduciary duties to do so.

110. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del.2004) (quoting *Agostino v. Hicks*, 2004 WL 443987, at *7 (Del.Ch. Mar. 11, 2004)).

111. *Id.*

Withholding information from shareholders violates their rights even if it leads to them making the "right," and even highly profitable, result. To hold otherwise would be to state that a corporation may request consent from its shareholders, withhold relevant information, and only be liable for damages in those situations in which it appears *ex post* that the company has suffered financial damages. This cannot be, and is not, the law of Delaware.

Nevertheless, plaintiffs have failed to suggest any form of relief that can be granted to them in a direct claim and, thus, Count VIII must be dismissed. In a direct suit based upon a disclosure claim, the Supreme Court has been very clear: damages to plaintiff shareholders are limited only to those that arise logically and directly from the lack of disclosure, and nominal damages are appropriate only where the shareholder's economic or voting rights have been injured.[112] Plaintiffs' allegations demonstrate harm to the corporation that accrued from the lack of disclosure in the 2004 proxy, but even assuming that defendants obtained "ill gotten gains" through their election, the shareholders would have no direct right to share in any disgorgement of these benefits. On the other hand, there is no allegation that as a result of the 2004 election plaintiffs' rights to a share of economic profits or access to the shareholder franchise have been impeded. Lacking any form of relief that might be granted, plaintiffs have failed to state a claim, and thus Count VIII must be dismissed.[113]

### H. Count IX: Unjust Enrichment

As a parting shot, plaintiffs level a claim for unjust enrichment against various of the individual defendants and TLP, alleging that they have benefited at the expense of the company through self-dealing transactions and breaches of fiduciary duties. Defendants rightly point out that no part of this Count presents new factual issues, but that does not render it irrelevant. Count IX presents an opportunity to assign liability to an individual director without requiring plaintiffs to demonstrate fault with respect to that director.

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[114] A defendant may be liable "even when the defendant retaining the benefit is not a wrongdoer" and "even though he may have received [it] honestly in the first instance."[115] Although neither

---

**112.** *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773–74 (Del.2006).

**113.** Curiously, both parties suggest that plaintiffs have requested that I void the 2004 elections. Defs.' Opening Br. in Supp. of Mot. to Dismiss at 48 ("Plaintiffs seek to void this election in 2004...."); Pls.' Answering Br. in Opp'n to Mot. to Dismiss at 59 ("Under the factual circumstances present here, the equitable remedy of voiding past elections is available ..."). The consolidated complaint, however, contains only a request for damages. Consol. Compl. at ¶¶ 209–210. In any event, equitable relief would be inappropriate for at least two reasons. First, given that the consolidated complaint admits that Don Tyson directly or indirectly controls over 80% of the voting power of the company, it seems highly unlikely that any order insisting upon new elections would foster some different result. Second, the board has survived two subsequent elections regarding which plaintiffs make no allegations of impropriety. Overturning the result of the 2004 elections would thus have no real effect, as it is beyond this Court's power to insist that new directors travel backwards in time a number of years to take up their posts.

**114.** *Schock v. Nash*, 732 A.2d 217, 232–233 (Del.1999).

**115.** *Id.*

party develops the concept in their brief, the structure of the complaint suggests that were certain directors to be found liable for breaches of fiduciary duty under other theories, Count IX would allow the Court to force other directors to disgorge, for example, improperly spring-loaded options or profits from related-party transactions without having to show a breach of fiduciary duty on the part of a particular director.

Given the considerable complexity of the other eight counts of the complaint, it would be difficult for me to conclude there is no "reasonably conceivable set of circumstances"[116] under which it might later be determined that one of the fourteen named defendants was unjustly enriched. I will provide only one example that could reasonably be imagined. TLP is included in this Count, and yet TLP is not itself a Tyson director. Some of the Tyson family stock options—property that might be subject to disgorgement—may have been transferred from any one of the family members to TLP, and the resolution of this matter may result in the need to enjoin TLP to return those shares. For this reason, I will not dismiss Count IX.

## VII. CONCLUSION

Based on the foregoing analysis of the complaint, the following list of hits and misses describes the issues that remain before the Court as the case goes forward. Counts I and VIII are dismissed in their entirety, and Count VII must be dismissed as procedurally improper. Count IV remains only with regard to related-party transactions that were either not disclosed before or undertaken after February 16, 2002 and were allegedly not reviewed by an independent committee. Count V goes forward only as to disclosure failures in regard to Don Tyson's perquisites that led to the SEC settlement. Counts II, VI and IX survive completely intact, while Count III survives as to the seven members of the compensation committee.

Plaintiffs and defendants shall confer and submit an implementing form of Order.

---

**116.** *In re Gen. Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 168 (Del.2006) (quoting *Savor,* *Inc. v. FMR Corp.,* 812 A.2d 894, 896–97 (Del.2002)).